**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**
No. 97-2124

Access Telecommunications,　　　　*
debtor-in-possession on behalf of　*
itself and all others similarly situated,　*
formerly known as Unified　　　　*
Telecommunications, L.L.C.,　　　*
　　　　　　　　　　　　　　　*
　　　　　　Appellant,　　　　　*　Appeal from the United States
　　　　　　　　　　　　　　　*　District Court for the
　　v.　　　　　　　　　　　　*　Eastern District of Missouri.
　　　　　　　　　　　　　　　*
Southwestern Bell Telephone　　　*
Company,　　　　　　　　　　　*
　　　　　　　　　　　　　　　*
　　　　　　Appellee.　　　　　*

_____

Submitted: December 12, 1997
Filed: February 26, 1998

_____

Before BOWMAN, WOLLMAN, and LOKEN, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Access Telecommunications (Access) appeals the order of the District Court[1] dismissing its claim against Southwestern Bell Telephone Company (SWBT). Access

---

[1] The Honorable Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

had filed a class action under the Communications Act of 1934, see 47 U.S.C. §§ 202, 203, 207 (1994), alleging that SWBT had been overcharging for telephone access services. SWBT moved to dismiss the action, arguing that primary jurisdiction to decide the issues rested with the Federal Communications Commission (FCC). In its opinion, the District Court noted that a party claiming damages against a common carrier such as SWBT generally has its choice to file a complaint either with the FCC or in federal court. See District Ct. Order at 2. But in the end the District Court agreed with SWBT and dismissed the action. This appeal followed.

Access claims that the FCC does not have primary jurisdiction over the issues presented in this case. Access argues that the District Court erred in dismissing the action because none of the reasons for invoking the primary jurisdiction doctrine is present. Access further asserts that, even if the FCC does have primary jurisdiction, the District Court should not have dismissed but instead should have stayed the action.

I.

Access resells long-distance services by connecting customers to various long-distance providers. Access uses SWBT's local lines to offer the service. SWBT allows resellers such as Access to control the quality and cost of the interconnection by giving them a choice of twelve different voice grades (VGs). The VGs range from one to twelve, with VG 1 representing the lowest level of quality and VG 12 representing the highest level of quality. Quality is measured in terms of factors such as distortion and echo control. Charges for the interconnection increase as the level of VG increases. In this case, Access sought to purchase VG 7 service from SWBT.

As required by federal law, common carriers must file with the FCC tariffs setting forth a schedule of charges for the various services they provide. See 47 U.S.C. § 203. Accordingly, SWBT filed Tariff No. 73 (the Tariff), which established charges

for each VG level.  The FCC approved the Tariff, and now SWBT must provide access services pursuant to the terms of the Tariff.  See id. § 203(c).

SWBT provides VG 7 service on either a two-wire circuit or a more expensive four-wire circuit.  The Tariff sets forth two schedules, indicating the price for each circuit. See  J.A. at 91 (Tariff 7.3.4(G)(1)).  Thus, a VG 7 interconnection on a four-wire circuit has a higher price schedule than a VG 7 interconnection on a two-wire circuit.   The Tariff indicated that the VG 7 service must conform to specific transmission standards,  see id. at 73 (Tariff 7.3.1(B)), meaning that items such as attenuation distortion, echo control, impulse noise, and phase jitter cannot fall to unacceptable levels.  These standards are to ensure the quality of the signal requested by the reseller.  The Tariff incorporates a Technical Specifications Package (TSP), which sets forth a detailed listing of these standards for VG 7 service.  The choice by the resellers of whether to purchase two-wire or four-wire circuits depends upon the capabilities of the resellers' system; they may purchase the less expensive two-wire circuit only if the transmission standards set forth in the Tariff and TSP are being met.  For example, as long as attenuation distortion remains at or below the level set forth in the TSP, the reseller may use a two-wire circuit in obtaining VG 7 service.  But as soon as attenuation distortion increases to an unacceptable level (as defined by the TSP), the reseller must use a four-wire circuit.

In January 1991, SWBT began requiring Access to purchase VG 7 service on the more expensive four-wire circuit.  SWBT claimed it had to charge this rate because the distance from SWBT's central office to the connection point (the "local loop connection") exceeded 6,000 feet in length.  SWBT contends that distortion and echo loss increase to unacceptable levels (as defined by the TSP) when the distance gets beyond 6,000 feet, making it impossible consistently to maintain VG 7 quality on a two-wire circuit.  Thus, in order to comply with the quality standards set forth in the Tariff and TSP, SWBT maintains that it must run VG 7 service on a four-wire circuit for local loop connections exceeding 6,000 feet.

Access points out that the length of the resellers' local loop connection is not a specification set forth in the Tariff or the TSP. Access argues that this arbitrary 6,000-foot limit on two-wire circuits violates federal law because, in establishing this limit, SWBT is not abiding by the terms of the Tariff. Under the terms of the Tariff, Access maintains it is entitled to receive VG 7 service on the less expensive two-wire circuit. Access seeks to have the District Court grant it relief against SWBT on this federal law claim.

## II.
### A. Primary Jurisdiction Doctrine

In their briefs, both parties argue based on the assumption that we review de novo the issue of whether the doctrine of primary jurisdiction was properly applied by the District Court.[2] Without deciding the standard-of-review question, which is best left to be resolved in a case in which it is contested, we accept the parties' invitation to review the primary jurisdiction issue de novo.

Primary jurisdiction is a common-law doctrine that is utilized to coordinate judicial and administrative decision making. See Red Lake Band of Chippewa Indians v. Barlow, 846 F.2d 474, 476 (8th Cir. 1988). The doctrine allows a district court to refer a matter to the appropriate administrative agency for a ruling in the first instance, even when the matter is initially cognizable by the district court. See Iowa Beef Processors, Inc. v. Illinois Cent. Gulf R.R. Co., 685 F.2d 255, 259 (8th Cir. 1982). There exists no fixed formula for determining whether to apply the doctrine of primary jurisdiction. See United States v. Western Pac. R.R. Co., 352 U.S. 59, 64 (1956). Rather, in each case we consider whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes for which the doctrine was created.

---

[2]Both parties cite National Communications Ass'n v. AT&T, 46 F.3d 220, 222 (2d Cir. 1995).

See United States v. McDonnell Douglas Corp., 751 F.2d 220, 224 (8th Cir. 1984). We are always reluctant, however, to invoke the doctrine because added expense and undue delay may result. See id.

One reason courts apply the doctrine of primary jurisdiction is to obtain the benefit of an agency's expertise and experience. The principle is firmly established that "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." Far East Conference v. United States, 342 U.S. 570, 574 (1952). In fact, agency expertise is the most common reason for applying the doctrine. See Barlow, 846 F.2d at 476. Another reason is to promote uniformity and consistency within the particular field of regulation. See Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 303-04 (1976).

Access points to the distinction between a challenge to the reasonableness of a tariff and a challenge that a tariff has been violated. The former is properly brought before an administrative agency, while the latter is properly brought before a court. See Pennsylvania R.R. Co. v. Puritan Coal Mining Co., 237 U.S. 121, 131-32 (1915). Access argues that, because the sole issue is whether SWBT violated the Tariff, the action belongs in district court. We disagree.

Congress granted to the FCC the authority to determine whether "[a]ll charges, practices, classifications, and regulations" are reasonable. 47 U.S.C. § 201(b). Here SWBT is classifying Access under a four-wire circuit price schedule. The issue is whether the 6,000-foot limitation is a reasonable classification. This action clearly falls within the FCC's statutory authority to determine the reasonableness of SWBT's classification. See id.

Furthermore, to determine whether the classification is reasonable, it will be necessary to become embroiled in the technical aspects of VG 7 service. The FCC has

far more expertise than the courts on matters such as circuit designs, signal transmissions, noise attenuation, and echo return loss. Thus, the need to draw upon the FCC's expertise and experience is present here. "[W]here words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application," as is the case here, the issue should first go to the appropriate administrative agency. Western Pac., 352 U.S. at 66.

We conclude that the District Court did not err by determining that under the primary jurisdiction doctrine the court should stay its hand to allow the FCC to consider the issues raised in Access's complaint.

## B. District Court's Dismissal

After the District Court determined that primary jurisdiction rested with the FCC, it dismissed the suit. A district court "has discretion either to [stay the case and] retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." Reiter v. Cooper, 507 U.S. 258, 268 (1993).

The District Court did not abuse its discretion in dismissing the suit. Access argues that, because a dismissal does not toll the statute of limitations, Access could be unfairly disadvantaged if it chose to refile in federal court after the FCC renders a decision on its claim against SWBT. Access's argument is without merit.

Because we hold today that the doctrine of primary jurisdiction applies, Access's next course of action regarding this claim will be to petition directly to the FCC. See 47 U.S.C. § 208(a). Then, the FCC is statutorily obligated to investigate the complaint, see id., and issue an order within five months. See 47 U.S.C.A. § 208(b)(1) (West Supp. 1997). The FCC's order is then final and may be appealed. See 47 U.S.C. § 208(b)(3). If either Access or SWBT chooses to seek judicial review of the FCC's final order, it would do so under 47 U.S.C. § 402(a), which provides that appeals "shall

be brought as provided by and in the manner prescribed in chapter 158 of title 28." <u>See id.</u> § 402(a). Thus, an aggrieved party would file a petition for review in a court of appeals wherein venue lies within sixty days after the entry of the FCC's final order. <u>See</u> 28 U.S.C. §§ 2342(1) (jurisdiction of court of appeals), 2343 (venue), and 2344 (sixty-day filing period). The statute of limitations applicable to the original action in the District Court therefore is not implicated, and Access is not unfairly disadvantaged by the District Court's dismissal.

## III.

For the above reasons, we conclude that the District Court did not err in applying the doctrine of primary jurisdiction to this case. Moreover, we hold that the District Court did not abuse its discretion in dismissing the suit. Accordingly, we affirm the order of the District Court in all respects.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT